NOT FOR PUBLICATION

**FILED & ENTERED**

**OCT 19 2015**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** Ogier    **DEPUTY CLERK**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No.: 1:14-BK-15563-MB |
| | Chapter 13 |
| GUILLERMO QUEVEDO, | MEMORANDUM OF DECISION RE: MOTION TO VALUE REAL PROPERTY AND STRIP JUNIOR LIEN OF 21ST MORTGAGE CORPORATION |
| Debtor. | |

   On February 4, 2015, chapter 13 debtor Guillermo Quevedo (the "Debtor") filed the *Debtor's Notice of Motion and Motion to Avoid Junior Lien on Principal Residence [11 U.S.C. § 506(d)]* (Dkt. 12) (the "Motion"). The Motion seeks to avoid, contingent on the Debtor's receipt of a chapter 13 discharge in this case, the second priority deed of trust (the "2nd DOT") held by 21st Mortgage Corporation ("TFMC") against the debtor's primary residence, a 1,046 square foot single family home, located at 8030 Vantage Avenue, North Hollywood, CA 91605, APN 2309-027-009 (the "Real Property").

**MEMORANDUM OF DECISION**

The Debtor seeks this relief pursuant to the holdings in *Zimmer v. PSB Lending Corp. (In re Zimmer)*, 313 F.3d 1220 (9th Cir. 2002) and *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36 (B.A.P. 9th Cir. 1997), which held that a wholly unsecured lien is not protected by the anti-modification clause of Bankruptcy Code section 1322(b)(2). The 2nd DOT secures a debt to TFMC of approximately $110,686.21. *See* Claim No. 1-1.[1]

TFMC objects to the Motion.[2] TFMC argues that the value of the Real Property exceeds the amount of the debt secured by the first priority deed of trust encumbering the property (the "1st DOT"). As such, TFMC contends that its claim is not wholly unsecured and that its lien has at least *some* value. The Debtor contends that the Real Property is not worth more than the amount due under the 1st DOT, and that the 2nd DOT therefore is avoidable.

There is no dispute over the relevant legal principles. The parties agree that the Debtor may avoid the 2nd DOT if the value of the Real Property does not exceed the amount of the debt owing under the 1st DOT. They agree further that the relevant date for valuation of the Real Property is the petition date, December 17, 2014 (the "Petition Date"). The only issue between the parties is the factual question of the fair market value of the Real Property as of the Petition Date.

---

[1] There is some discrepancy in this amount, although it is not critical to the analysis set forth in this Memorandum. The *Opposition to Debtor's Motion to Avoid Junior Lien and Confirmation of Debtor's Chapter 13 Plan* filed by TFMC asserts as of the date thereof, February 25, 2015, that the current balance due and owing was $109,378.04, and that the payoff amount is increasing at the rate of $5.94 per day.

[2] *See Opposition to the Debtor's Motion to Avoid Junior Lien and Confirmation of Debtor's Chapter 13 Plan* (Dkt. 17) (the "Opposition"); *Declaration of Robert Bonczek in Support of Opposition to Debtor's Motion to Avoid Junior Lien and Confirmation of Debtor's Chapter 13 Plan* (Dkt. 18); *Declaration of Jackie Valenzuela in Support of Opposition to Debtor's Motion to Avoid Junior Lien and Confirmation of Debtor's Chapter 13 Plan* (Dkt. 19).

# I. BACKGROUND

**A. Procedural Background**

The Court held an initial hearing on the Motion on March 24, 2015, before the Honorable Maureen A. Tighe. At that hearing, the parties agreed to address the evidentiary dispute by way of competing appraisals. In other words, each party would submit a declaration from its appraiser stating an opinion of value for the Real Property, each party thereafter would submit a critique of the other party's appraisal, and the Court would decide the question of value based on those submissions.

In accordance with this agreed arrangement, each of the Debtor and TFMC filed an appraisal[3] and then a critique of the other's appraisal.[4]

On June 4, 2015, following the reassignment of this case to the undersigned United States Bankruptcy Judge, the Court held a continued hearing on the Motion. At that hearing, the Court inquired of the parties whether each of them, in agreeing to the foregoing procedure, had intended to waive the right to cross-examine the other party's valuation expert.

Counsel for TFMC advised at the hearing that TFMC did not intend to cross-examine the Debtor's valuation expert and waived the right to do so. At the request of the Debtor's counsel, the Court continued the hearing further, so that counsel could discuss the matter with her client and thereafter confirm her client's position on the question posed by the Court.

During a telephonic hearing held on June 11, 2015, counsel for the Debtor advised that the Debtor had determined to waive his right to cross-examine TFMC's valuation expert.

---

[3] *See Declaration of Jackie Valenzuela in Support of Opposition to Debtor's Motion to Avoid Junior Lien and Confirmation of Debtor's Chapter 13 Plan* (Dkt. 19) (the "Debtor's Appraisal"); *Declaration of Edgar Zacarian in Support of Opposition to Debtor's Motion to Avoid Junior Lien and Confirmation of Debtor's Chapter 13 Plan* (Dkt. 31) (the "Lender's Appraisal").

[4] *See Supplemental Declaration in Support of the Debtor's Motion to Avoid the Junior Lien of 21st Mortgage Corporation* (Dkt. 33) (the "Debtor's Critique"); *Declaration of Edgar Zacarian in Review of Debtor's Appraisal* (Dkt. 34) (the "Lender's Critique").

### B. Amount of the Senior Indebtedness

The 1st DOT is held by the Federal National Mortgage Association and/or Seterus, Inc. The parties agree that the amount of the indebtedness secured by the 1st DOT was $378,844.56 at or near the Petition Date.[5] Accordingly, in order for the Debtor to be able to avoid the 2nd DOT as a wholly unsecured lien under *In re Zimmer* and *In re Lam*, the value of the Real Property as of the Petition Date must be no more than $378,844.56. For the reasons discussed below, the Court has determined that the value of the Real Property as of the Petition Date exceeded that amount.

### C. Competing Appraisals

The Real Property consists of a single family residence located in North Hollywood, California, containing three bedrooms, one bathroom, and a total of approximately 1,046 square feet of gross living area. The Debtor's Appraisal of the Real Property was prepared by Keyvan Kiarash of K1 Appraisal Service, a certified residential real estate appraiser ("Debtor's Appraiser"). The Debtor's Appraisal expresses an opinion of value for the Real Property of $360,000.00, as of November 2, 2014, using the sales comparison method of valuation. The Debtor's Appraisal notes that "average property values are up 18.5%, year over year within the subject's zip code. However, it appears that property values within the subject's neighborhood is stabilizing at this time."

The Lender's Appraisal of the Real Property was prepared by Edgar Zacarian of Zacarian Appraisal Services, also a certified residential real estate appraiser ("Lender's Appraiser"). The Lender's Appraisal expresses an opinion of value for the Real Property of $405,000.00, as of December 17, 2014. The Lender's Appraisal utilizes the sales comparison method of valuation, as well as the cost approach to value. The Lender's Appraisal reaches the same conclusion under both methods of valuation. The Lender's Appraisal likewise notes that home prices in the area have recently stabilized. Dkt. 31-1 at 5 ("median comparable home price in the subject's market area stabilized over the past (6) months"); 16 ("median comparable home price in the subject's market area appears to have stabilized over the past 12 months").

---

[5] *See* Motion at 2; Opposition at 2.

3
**MEMORANDUM OF DECISION**

The Lender's Appraisal goes further by providing a detailed "Inventory Analysis" showing market trends for competing properties within the subject area.  The market data in the Inventory Analysis is grouped by date range: (i) prior 7-12 months, (ii) prior 4-6 months, and (iii) current – 3 months.[6]  The Inventory Analysis shows that over the course of these time periods, the number of comparable sales declined and the median number of comparable sale days on the market increased.

Perhaps most significant, the data substantiates the "stabilization" of closed sale prices.  In the prior 7-12 months, the median comparable sales price was $350,000.00.  In the prior 4-6 months the median comparable sales price was $370,000.00.  In the prior 3 months through the current date (i.e., the effective date of the Lender's appraisal), the median comparable sales price was $371,750.00.  Thus, between the last two measurement periods – 4-6 months prior and 0-3 months prior – the median comparable sales price increased by only 0.473%.

## II.  JURISDICTION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (K).  This Court has constitutional authority to enter a final judgment on the Motion.

## III.  APPLICABLE LAW

The value of a secured claim may be determined pursuant to a noticed motion under Bankruptcy Code section 506(a), and the valuation incorporated into the debtor's proposed plan. *See* 11 U.S.C. § 506(a); Fed. R. Bankr. P. 3012; *see also In re Reyes*, 401 B.R. 910 (Bankr. C.D. Cal. 2009).  Under Bankruptcy Code section 506(d), a claim secured by a lien typically is bifurcated into a secured claim and unsecured claim, based on the value of the estate's interest in

---

[6] Although the Inventory Analysis does not expressly state that the reference point for "current" activity is the effective date of the Lender's Appraisal, December 17, 2014, the Court concludes that this is a reasonable inference from the overall structure of the appraisal and the incorporation of the Inventory Analysis as an addendum to the appraisal.

the property that is subject to that lien. The process of bifurcating a claim into secured and unsecured claims, and treating the claims differently under a plan, is commonly referred to as "lien stripping."

Generally, "lien stripping" is prohibited on a debtor's principal residence in chapter 13. A chapter 13 plan may not modify the rights of a creditor whose claim is secured "only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2); *see Nobelman v. American Sav. Bank*, 508 U.S. 324, 327-28 (1993). In *Nobelman,* the Supreme Court held that this provision precluded the modification of a claim secured by a lien that was partially secured and partially unsecured.

However, when the claim of a lien holder secured only by the debtor's principal residence is a completely or wholly unsecured claim, the anti-modification provision in section 1322(b)(2) does not apply; in that circumstance, a debtor may utilize section 506(a) under a chapter 13 plan to effectively "strip off" a wholly unsecured lien. *In re Zimmer*, 313 F.3d 1220; *In re Lam*, 211 B.R. 36.

A lien is wholly or completely unsecured if there is not one dollar of value securing that lien. *See In re Lam*, 211 B.R. at 41 ("[A] one dollar difference in property value could have a profound effect on a secured creditor's rights. If property valued at $50,000.00 is encumbered by a first mortgage of $50,000.00 and a second mortgage of $20,000.00, the second mortgage has no secured claim under section 506(a)."). If the lien is "stripped," the lienholder's claim is treated as an unsecured debt under the proposed plan and the lien remains on the debtor's property until the debt is paid off or the debtor obtains a discharge. *See* 11 U.S.C. § 1325(a)(5)(B).

Notwithstanding a debtor's ability to "strip off" a wholly unsecured junior lien on a principal residence, the general anti-modification provision of Bankruptcy Code section 1322(b)(2) still applies to a partially secured lien. If even one dollar secures the lien on the principal residence, a debtor may not modify the rights of the creditor and "strip off" the lien. Thus, for example, if a chapter 13 debtor's principal residence is valued at $50,001.00 and is encumbered by a first mortgage of $50,000.00, and a second mortgage of $20,000.00, Bankruptcy Code section 1322(b)(2) precludes the second mortgage from being stripped off. In that circumstance, the

second mortgage holder holds a secured claim of $1.00 and under *Nobelman* no modification is permissible under section 1322(b)(2). *See In re Lam*, 211 B.R. at 41.

On a chapter 13 debtor's motion to establish the value of property under Bankruptcy Code section 506(a), for the purpose of "stripping" an allegedly unsecured junior lien, the debtor bears the ultimate burden of proof. *See, e.g., In re Henderson*, 2010 Bankr. LEXIS 5014, *10-11 (Bankr. C.D. Cal. Nov. 5, 2010) (citing burden of proof authorities under section 506(a)). In accordance with the foregoing discussion, the Debtor's burden is to demonstrate that the value of the property, as of the Petition Date, i.e., December 17, 2014, was equal to or less than the amount of the senior lien on the property. *Id.*

## IV.  ANALYSIS

The Court finds that both the Debtor's Appraisal and the Lender's Appraisal are flawed, and that neither appraisal can be adopted in its entirety. As is often the case with competing appraisals, the analysis of comparable sales in each appraisal excludes sales that should have been considered in the other. Moreover, each appraisal includes comparable sales that do not provide reliable comparisons and should have been excluded.

The following analysis addresses these deficiencies in order to reach a fair market value for the Real Property. First, the Court addresses the comparable sales utilized by each appraisal, identifying comparables that should have been disregarded and making adjustments to certain other comparables, where appropriate. Second, the Court uses the resulting dataset of comparable sales to calculate the fair market value of the Real Property.[7]

---

[7] A portion of the Lender's Appraisal entitled "Cost Approach to Value" contains calculations suggesting that the value of the Real Estate also may be determined under the "cost approach." Dkt. 31-1 at 7. According to the author of the Lender's Appraisal, however, the cost approach was not given any weight in determining the value of the Real Property, "as the sales comparison approach is considered the most reliable indicator of current market value, as it best reflects the actions of a buyer and seller in an open and competitive market." Dkt. 31-1 at 15. Accordingly, the Court's analysis is focused on a comparison of the appraisers' respective analyses under the comparable sales approach.

### A. Debtor's Comparables

#### 1. Debtor's Comparable Sale No. 1

Debtor's Comparable Sale No. 1 is a 1,008 square foot, three-bedroom, one-bedroom house, located 0.38 miles from the Real Property. This comparable sold in August 2014 for $330,000.00. After adjustment for its lack of a swimming pool (which the Real Property has), this comparable is valued by the Debtor's appraisal at $340,000.00.

The Lender's Appraiser argues that this sale occurred four months before the Petition Date, but that the price used in the appraisal has not been adjusted for upward changes in the market between that date and the Petition Date. The Lender's Appraiser criticizes this comparable because there were no photos of the property provided and the property was listed only two days before being sold, which the Lender's Appraiser contends indicates a sale for less than fair market value.

As indicated above, the Lender's Appraisal indicates that the median comparable home sale prices in this area, in the period 0-3 months before the Petition Date, were 0.473% higher than they were in the period 4-6 months before the Petition Date. On this basis, the Court will adjust this comparable upward by 0.473%. In other words, the Court will treat this comparable as being $341,608.10.

As for the other criticisms offered by the Lender's Appraiser, the Court is not persuaded. First, while photographs undoubtedly might be helpful to calibrating an appraisal, the Court is not persuaded that the absence of photographs undermines the credibility of the Debtor's Appraisal.

Second, while it is possible that a listing period of only two days may indicate that the property was not fully marketed, the Court is not persuaded that this is necessarily the case. There is no evidence, for instance, of what marketing efforts may have occurred before the listing was active, how many offers were received, or what the substance of those offers may have been. There is simply insufficient evidence for the Court to conclude that the sale price did not represent the fair market value of the property.

### 2. Debtor's Comparable Sale No. 2

Debtor's Comparable Sale No. 2 is a 1,246 square foot, two-bedroom, two-bathroom house, located 0.55 miles from the Real Property. This comparable sold in June 2014 for $340,000.00. After various adjustments, this comparable is valued by the Debtor's Appraiser at $333,000.00. The Lender's Appraiser criticizes this comparable for its age in relation to the Petition Date, a lack of photos, failure to adjust for adjacent power lines, an incorrect adjustment for the number of bathrooms, and the absence of an adjustment for the fact that it has only two bedrooms.

The Court finds that it is appropriate to disregard this comparable entirely. Although adjustments conceivably may be made for differences in room count, the number of rooms is a significant factor in home pricing. The Court has been provided with insufficient testimony on the proper adjustment for this difference, and there are numerous other three-bedroom comparables to rely on. Accordingly, the Court will disregard the Debtor's Comparable Sale No. 2.

### 3. Debtor's Comparable Sale No. 3

Debtor's Comparable Sale No. 3 is a 1,028 square foot, three-bedroom house, one-bathroom house located 0.32 miles from the Real Property. This comparable sold in September 2014 for $365,000.00. After various adjustments, this comparable is valued by the Debtor's Appraiser at $368,000.00.

The Lender's Appraiser criticizes this comparable because the property was sold "as is," within three days of the listing date. Again, as discussed in Section IV.A.1, the Court is not persuaded on the record before it that these circumstances are indicative of a price that is less than fair market value. However, because the sale was closed in September 2014, the Court will add an additional 0.473%. Accordingly, the Court will treat this comparable sale for purposes of its valuation determination as $369,740.54.

### 4. Debtor's Comparable Sale No. 4

Debtor's Comparable Sale No. 4 is a 1,026 square foot, three-bedroom, two-bathroom house, located 0.44 miles from the Real Property. This comparable sold in September 2014 for $381,000.00. After various adjustments, this comparable is valued by the Debtor's Appraiser at $368,000.00. Among other things, the Debtor's Appraisal reflects a downward adjustment of

$6,000.00, because this comparable has two bathrooms, whereas the Real Property only has one bathroom.

In the Lender's Critique, the Lender's Appraiser testifies that the $6,000.00 is not the appropriate adjustment amount for a difference of bathrooms in homes of this price range. Lender's Critique at ¶ 4.a. Instead, the Lender's Appraiser testifies that the appropriate adjustment amount is $10,000.00. *Id.* This is somewhat of a surprise coming from the Lender's Appraiser, because a higher bathroom adjustment amount will result in the comparable price for Comparable Sale No. 4 being *lower*.[8] Nevertheless, the Court will adopt the approach recommended by the Lender's Appraiser, which reduces the price of this comparable to $377,000.00.

The Lender's Appraiser criticizes this comparable because the sale closed in August 2014, but the comparable price has not been adjusted to reflect market changes between that time and the Petition Date. Accordingly, the Court will add an additional 0.473%, for the reasons discussed above, and will treat this comparable sale, for purposes of the Court's valuation determination, as $378,783.10.

### 5. Debtor's Comparable Sale No. 5

Debtor's Comparable Sale No. 5 is a 1,008 square foot, three-bedroom, one-bathroom house, located 0.21 miles from the Real Property. This comparable is also Lender's Comparable No. 2, as reflected in the Lender's Appraisal. At the time this comparable was included in the Debtor's Appraisal it had not yet sold. It is axiomatic that the asking price (even with a purported adjustment for the fact that it is merely an asking price) is inherently less indicative of the value of the property than the price at which it actually sold. According to the Lender's Appraisal, the actual sale price of this property was $385,000.00. The Court will use this amount as the base price of this comparable.

---

[8] Because Comparable Sale No. 4 has two bathrooms, the application of a downward adjustment to the actual sale price of that home is necessary to render it comparable to the Real Property, which has only one bathroom.

9
**MEMORANDUM OF DECISION**

Both appraisers made adjustments to the base price of this comparable, but the adjustments differ and must be resolved. First, the Debtor's Appraiser applied a $12,000.00 reduction to this comparable because, as of the date of the Debtor's Appraisal, this comparable was a *pending* sale rather than a closed sale. The Court need not make such an adjustment because it is utilizing the actual price at which the sale transaction closed.

Second, both appraisers add $10,000.00 to the sale price of this comparable based on the fact that this home does not have a pool. The Real Property, by contrast, has a pool. Because the appraisers agree, the Court will make this adjustment.

Third, both appraisers make adjustments on account of differences in heating and cooling systems, but the amount of the adjustments differs. The Debtor's Appraiser subtracts $5,000.00 from the base price; the Lender's Appraiser subtracts $7,000.00. The Court will average these numbers and deduct $6,000.00 for differences in the heating and cooling systems.

Fourth, the Lender's Appraiser subtracts $2,000.00 because this comparable has a garage, but the subject property has a converted garage (which is apparent from the photographs attached to that appraisal). The Debtor's Appraiser did not make this adjustment, but also did not address this issue in the Debtor's Critique. Accordingly, the Court infers that this adjustment is appropriate and will apply it to the sale price of this comparable.

Finally, both appraisals make adjustments for differences in the condition of the comparable and the Real Property, but those adjustments differ significantly. The Debtor's Appraisal *deducts* $3,000.00 from the sale price of this comparable, suggesting that it is in slightly better condition than the Real Property. The Lender's Appraisal *adds* $15,000.00, suggesting the opposite. Indeed, the Lender's Appraiser notes that "the condition [of this comparable] is slightly inferior." Lender's Critique at ¶ 4.b.

The Court finds these adjustments difficult to reconcile. Both appear reasonable. There is minimal detail provided regarding the condition of this comparable and the Court, without the benefit of live testimony, is not able to make credibility judgments, or ask its own questions. Under these circumstances, the Court concludes that the most fair and appropriate way to resolve this adjustment is to use the average of the two amounts: $6,000.00.

Thus, for purposes of a sales comparable analysis, the Court calculates the value of Debtor's Comparable No. 5 as follows:

| | |
|---|---|
| Actual Sale Price | $385,000.00 |
| Pool Adjustment | $10,000.00 |
| HVAC Adjustment | -$6,000.00 |
| Garage Adjustment | -$2,000.00 |
| Condition Adjustment | $6,000.00 |
| Total Comparable Amount | $393,000.00 |

### 6. Debtor's Comparable Sale No. 6

Debtor's Comparable Sale No. 6 in the Debtor's Appraisal is not a comparable *sale* at all. The information provided for Comparable Sale No. 6 indicates that the sale was pending at the time of the appraisal. In other words, it had not closed. Although the Debtor's Appraiser attempts to use this pending transaction as a comparable (i.e., by applying a $12,000.00 price adjustment), the Court does not believe it is necessary or appropriate to use this transaction in its valuation analysis. The Court finds that closed sales are a more reliable indication of the fair market value of a property than a proposed sale that has not yet closed. Moreover, the Court finds nothing in the record to indicate whether this sale ever closed and at what price.

### B. Lender's Comparables

### 1. Lender's Comparable Sale No. 1

Lender's Comparable Sale No. 1 is a 1,065 square foot, three-bedroom, one-bathroom house, located 0.43 miles from the Real Property. The Lender's Appraiser made net adjustments to this comparable of an additional $5,000.00, resulting in a comparable price of $405,000.00.

The Debtor's Critique does not specifically address this comparable or criticize the adjustments made to the sale price. Instead, the Debtor's Critique criticizes the Lender's Appraisal generally, arguing that the Lender's Appraiser selected comparables from the upper range of available comparables, rather than a broader distribution of those comparables.

But the Debtor's Critique is not persuasive for several reasons. First, the Debtor's Critique argues with too broad a brush. It introduces additional market information about potential comparables, but lacks the specificity reflected in either of the appraisals themselves. If there were

11
**MEMORANDUM OF DECISION**

additional comparables available, as the Debtor's Critique contends, then they should have been included in the Debtor's Appraisal and analyzed with the same specificity as the other comparables in that appraisal.

Second, the Court finds that its own assessment of value in this Memorandum – utilizing comparables from both appraisals – is a reasonable and appropriate means of correcting for the selection problem described by the Debtor's Critique. As reflected herein, the Court is considering comparables from across the range of available comparables.

Accordingly, the Court will utilize Lender's Comparable Sale No. 1 in its determination of the value of the Real Property.

### 2. Lender's Comparable Sale No. 2

This is the same real property as Debtor's Comparable Sale No. 5 and is discussed above in Section IV.A.5.

### 3. Lender's Comparable Sale No. 3

Lender's Comparable Sale No. 3 is a 1,316 square foot, three-bedroom, two bathroom house, located 1.48 miles from the Real Property. The reported sale price was $424,000.00, but after adjustments is treated by the Lender's Appraiser as having a sale price of $406,000.00. The only specific issue raised by the Debtor's Critique with respect to this property is the location: "Per USPAP guidelines, comparable properties that are used in an appraisal report should be located no more than one mile from a subject property." Debtor's Critique at ¶ 4.c.[9] Indeed, this comparable has a different postal address (Sun Valley vs. North Hollywood) and a different zip code (91352 vs. 91605).

The Lender's Appraisal does not speak specifically to the USPAP guidelines. The Lender's Appraisal states that the two properties are within the same "neighborhood boundaries" and that this property is being utilized as a comparable "due to the lack of more recent sales of similar size and location as the subject property." Dkt. 33 at 3. The Lender's Appraisal does, however,

---

[9] The referenced guidelines were not attached to any of the Debtor's submissions and are not part of the record.

1 acknowledge the distance from the Real Property.  The Lender's Appraisal indicates that this
2 property was given the least amount of weight in developing an opinion of value, from among the
3 three comparables considered by the Lender's Appraiser. Dkt. 31-1 at 6.
4     On the record presented, the Court is not persuaded by a preponderance of the evidence
5 that Lender's Comparable No. 3 should be disregarded in its entirety.  What is clear from the
6 record is that this comparable should be accorded less weight than the other comparables utilized to
7 assess value.  The Court concludes that a reasonable adjustment is to give this comparable is a
8 weight of 33.3%, as compared to the 100% weight given the other comparables that are within less
9 than one mile of the Real Property.

**4.  Lender's Other "Comparables."**

The Lenders' Appraisal references two other "comparables" for reference, but notes these were pending sales at the time, and were not actually used to develop a value for the Real Property. Accordingly, these two comparables, Lender's Comparable No. 4 and Lender's Comparable No. 5, are not used in the Court's assessment of value of the Real Property.

### C. Analysis of Value

As shown in the following chart, the Court has calculated the weighted average of the closed sale comparables discussed in Sections IV.A and IV.B above. Based on this analysis, the Court concludes that the value of the Real Property, as of December 17, 2014, was $379,398.04.

| Comparable | Price | Weight |
|---|---|---|
| Debtor's Comparable No. 1 | $341,608.10 | 1 |
| Debtor's Comparable No. 3 | $369,740.54 | 1 |
| Debtor's Comparable No. 4 | $378,783.10 | 1 |
| Debtor's Comparable No. 5/Lender's Comparable No. 2 | $393,000.00 | 1 |
| Lender's Comparable No. 1 | $405,000.00 | 1 |
| Lender's Comparable No. 3 | $406,000.00 | 0.33 |
| **Weighted Average** | **$379,398.04** | |

## V. CONCLUSION

The Court concludes that the Debtor has failed to meet his burden to demonstrate by a preponderance of the evidence that, as of the Petition Date, the value of the Real Property was equal to or less the value of the 1st DOT, i.e. $378,844.56. In other words, the 2nd DOT against the Real Property is <u>not</u> wholly unsecured. As such, it is subject to the anti-modification clause of Bankruptcy Code section 1322(b)(2) and may not be modified or "stripped" pursuant to *In re Zimmer*, 313 F.3d 1220 (9th Cir. 2002) or *In re Lam*, 211 B.R. 36 (B.A.P. 9th Cir. 1997). The Court will enter a separate order denying the Motion.

###

Date: October 19, 2015

*[signature: Martin R. Barash]*

Martin R Barash
United States Bankruptcy Judge